UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICKEY G. FLICK, JR.,

                  Plaintiff,                  Case No. 05-CV-70837

vs.

                                        HONORABLE GEORGE CARAM STEEH
                                        HONORABLE STEVEN D. PEPE

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                  Defendant.

_____/


**REPORT AND RECOMMENDATION**

### I.    BACKGROUND

Rickey Flick Jr. brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, IT IS RECOMMENDED that Plaintiff's motion for summary judgment be GRANTED IN PART and Defendant's motion for summary judgment be DENIED.

#### A. PROCEDURAL HISTORY

Plaintiff originally filed an application for DIB on November 10, 2003, claiming disability since August 25, 2003, due to cramping of his hands and feet (R. 61, 70). Plaintiff's claim was denied on initially February 3, 2004, and again on November 8, 2004, after an October 5, 2004, hearing by Administrative Law Judge (ALJ) Douglas N. Jones (R. 15-24). The Appeals Council declined review on February 19, 2005 (R. 4-6).

### B. BACKGROUND FACTS

### 1.     Plaintiff's Hearing Testimony

Plaintiff was born on February 15, 1972, graduated from high school in 1990 and had no post high school education or training (R. 299-300).  He was 5'11" and 195 pounds at the time of the hearing (R. 299 - 300).  He is right-handed (R. 300).  He lived in a house in Flint with his fiancee and son of just under 3 years of age (R. 299).

Plaintiff's past work included his most recent job as a machinist as well as a movie ticket taker, pizza deliverer and food service worker (R. 312-313).  He has not worked since August 25, 2003, when he left his job at a machine shop because he was having problems with his hands and feet "cramping and locking up".  He received short term disability benefits for 5 to 6 months but had not received any foodstamps, unemployment or Workers' Compensation benefits[1], nor was Plaintiff covered under any health insurance (R. 300 - 301).

Plaintiff has a driver's license and drove a couple times each week, but could not drive far because he was afraid his hands and legs would cramp up (R. 302-303).  He rode with his fiancee to visit his parents at Houghton Lake once or twice in 2003, but was uncomfortable riding in the car for that length of time (R. 303-304).

Plaintiff had laser eye surgery in 1999 and surgery on his left wrist and elbow due to carpal tunnel syndrome (R. 304).  Dr. Fritz performed the surgery.  Plaintiff followed up with her a "couple of times" in 2003 and last saw her in December 2003 (R. 305).  Plaintiff believed his carpal tunnel syndrome had gotten worse since the surgery (R. 305).  He had told this to Dr. Fritz who did not want to do further surgery and wanted to wait to see if "anything happened."  But the condition continued

---

[1]Plaintiff did have a Workers' Compensation claim pending at the time of the hearing (R. 301).

2

to worsen since he saw her in December 2003.  He had not seen any specialists other than Dr. Fritz.

Plaintiff stopped seeing Dr. Mohammad for his kidney problems in 2002 due to a change in his insurance (R. 305-306).  Dr. Learner had been Plaintiff's primary care physician for the last eight years, except for a period of time when he changed to an insurance plan in which Dr. Learner did not participate, at which time he switched to Dr. Humayun (R. 306).

Plaintiff had taken medicine for his blood pressure and for his diabetes, but at the time of the hearing was only taking medicine for his diabetes (R. 308).  Plaintiff explained that he had failed to take his Neurontin as prescribed at one time because it had been prescribed by two different doctors and he was confused as to what he was actually supposed to take (R. 308-309).

Plaintiff did not believe he could perform his past work as a pizza delivery worker because the "constant driving and the carrying of pizzas" involved would cause his hands and arms to cramp (R. 314).  He also felt he would be precluded from his past work involving food service or movie ticket taker because the constant use of his hands and arms would cause them to cramp and standing would cause his feet and legs to cramp.  He did not feel that a sit/stand option would remedy the situation as he could not sit or stand for very long and needed to lay down (R. 315).  He explained that he spent from 12 noon to 5:00 p.m. each day resting his arms and legs so that they would not cramp.  He averaged 10-25 episodes of cramping and locking up per day (R. 316).  When his hands were locked he could not use them.  When this happened at night he was kept awake, which made him more tired during the day.  He felt he had lost most of his strength in his left hand and had limited ability to grip or grab with that hand and no ability to grip or grab if it was cramped or locked (R. 316-317).  His hands cramped up if he tried to write too long and he could not sit for more than ½ hour (R. 317).

3

### 2.    Plaintiff's Disability Application

Plaintiff indicated in his disability application that he cared for his son[2] and watched television all day (R. 80).  His disability prevented him from doing anything involving his hands or feet.  His sleep was interrupted by the cramping in is hands, arms and feet.  He had difficulty buttoning his shirt and performing self care when his hands were cramped (R. 81).  He was able to fix "easy meals" a couple of times each week, but his fiancee did most of the cooking due to his hand cramping.  He did not perform any household chores or yard work (R. 82).  He shopped for groceries with his fiancee and his ability to handle money had not been affected by his disability (R. 83).  He had no problems with interpersonal relations, communications or memory (R. 85).

### 3.    Medical Evidence

On May 11, 1998, James Learner, D.O., diagnosed Plaintiff with bilateral background diabetic retinopathy with macular edema and recommended focal laser treatment (R. 96).

A March 22, 1999, excretory urography with nephrotomography revealed an enlarged prostate (R. 101).

On September 21, 1999, Plaintiff was diagnosed with verruca vulgaris[3] of the first, second and third fingers (R. 100).  He was treated in the office with a chemical blistering agent.

During a January 3, 2000, diabetic check consultation with Eric Zuckerman, D.O., Plaintiff demonstrated background retinopathy with possible macular edema (R. 104).  Dr. Zuckerman

---

[2]Plaintiff wrote "watch my son" in answer to Question No. 8, "what do you do from the time you wake up...", but then crossed it out (R. 80).  Yet in response to Question No. 9, "Do you take care of anyone else..." he indicated that he took care of his son".  Therefore, the undersigned assumes that Plaintiff does take care of his son as part of his daily activities.

[3]The human papillomavirus (HPV) causes the common wart or verruca vulgaris.
http://www.thedoctorsdoctor.com/diseases/verruca_vulgaris.htm.

suggested that Plaintiff follow-up with Dr. Mark Haimann.

A February 17, 2000, CT scan of the paraspinal sinuses revealed no abnormalities (R. 99).


Dr. Zuckerman performed a diabetic check on April 13, 2001, which revealed background retinopathy with no macular edema (R. 103). Dr. Zuckerman noted that Plaintiff was scheduled to see Dr. Haimann for a follow-up evaluation but had not done so.

Plaintiff saw Dr. Haimann, M.D., on April 25, 2001, who noted that Plaintiff had developed no new preproliferative changes and did not require further photocoagulation (R. 106). Dr. Haimann scheduled a follow-up examination for six-months.

On October 11, 2001, Plaintiff had a normal right shoulder x-ray.

On December 3, 2002, Plaintiff complained to Dabiruddin Humayun, M.D., of intermittent bilateral hand and leg cramping during work (R. 268). Dr. Humayun prescribed Klonopin and asked Plaintiff to follow up as needed. A right hand x-ray revealed atherosclerotic vascular calcifications (R. 270).

On December 11, 2002, Plaintiff visited Dr. Humayun with complaints including bilateral hand cramping lasting 2-3 weeks (R. 267). Dr. Humayun prescribed Klonopin and explained that if that did not work he would order an EMG.

On January 9, 2003, Dr. Humayun reevaluated Plaintiff regarding concerns including his complaints of hand cramping, which had been in both hands but was now more dominant in the left hand (R. 266). The symptoms were more prevalent at night and were affecting his work.

A January 15, 2003, upper extremity EMG revealed electrodiagnostic evidence of "bilateral median dysfunction at the wrist, carpal tunnel syndrome, sensory, demyelinating and axonal and mild

5

to moderate in nature ... most likely on the basis of diabetic neuropathy" (R. 265). There was no evidence of cervical radiculopathy or brachial plexopathy.

On January 21, 2003, Plaintiff was seen by Darin T. Clark, P.A., in Dr. Humayun's office complaining of cramping and spasms in his upper and lower extremities (R. 264).

On January 24, 2003, Plaintiff reported hand cramping to Dr. Humayun (R. 263). Dr. Humayun indicated that an EMG revealed bilateral carpal tunnel as well as some sensory deficit secondary to diabetic neuropathy, but no cervical or brachial radiculopathy. Dr. Humayun recommended Klonopin, a hand splint and physical therapy.

On February 4, 2003, Plaintiff was evaluated for physical therapy for his hand pain, cramping and inability to grasp objects (R. 250). Plaintiff reported that the therapy decreased the symptoms after the first three visits, but then reported an increase in symptoms after the next two visits and failed to attend his last two visits.

On February 18, 2003, Plaintiff was examined by Beena Nagappala, M.D., in Dr. Humayun's office and reported experiencing numbness in his left hand with intermittent pain for many months (R. 260). The pain was worse at night and had lately become intolerable when he was working. Physical examination revealed no swelling, negative Tinel and Phalen's signs and mild atrophy of the introitus muscle. Dr. Nagappala prescribed Neurontin and a orthopedic consultation.

On February 19, 2003, Plaintiff reported to Dr. Humayun that he could not go to work because it caused numbness (R. 259). Dr. Humayun gave him a disability note and set up a consultation with Dr. Dass.

On February 24, 2003, Plaintiff was referred by Dr. Humayun to A. George Dass, M.D., an orthopedic surgeon (R. 258). Plaintiff complained of bilateral numbness and tingling in his hands,

6

left greater than right, which bothered him at night and during work.  Dr. Dass determined that Tinel's, Durkan's and Phalen's tests were negative for carpal tunnel, but showed signs of cubital tunnel on the left elbow radiating into the small and ring finger.  There was no atrophy or intrinsic weakness or loss.  Dr. Dass concluded that Plaintiff had ulnar nerve compression at the elbow.  He recommended pillow splints at night to protect the ulnar nerve and prescribed Neurontin.  He stated that if this did not work after two months, submuscular nerve transposition would be indicated.

On February 25, 2003, Plaintiff had a follow up examination with Dr. Humayun.  He extended Plaintiff's disability until the following Monday because he had been unable to consult with Dr. Dass regarding Dr. Dass' findings and suggested treatment.

On March 7, 2003, Plaintiff visited Dabiruddin Humayun, M.D., to discuss two of his limitations to working (R. 252).  Dr. Humayun noted that Plaintiff had diabetic neuropathy with carpal tunnel as well as other radiculopathy, and he had limited him to working without frequent bending of the elbow or wrist and also restricted his lifting.  Dr. Humayun stated that Plaintiff was "quite mad" because "administration" was honoring the lifting restriction but not the bending restriction.  Dr. Humayun explained that there was nothing further he could do and referred Plaintiff to Dr. Dass.

On March 23, 2003, Plaintiff was seen at Tri-County Orthopedic, P.C. complaining of a chronic cough or lung problems, high blood pressure, kidney disorder and diabetes (R. 127-28).

Germaine R. Fritz, D.O., evaluated Plaintiff on March 24, 2003, at the request of Dr. Learner (R. 239-40).  Plaintiff complained that his left hand, particularly the ring and small finger have been numb and weak and he had trouble grasping objects (R. 239).  He reported that the symptoms had gotten worse since January and he had physical therapy but this provided no relief.  Physical

7

examination revealed weakness with abduction and adduction of the left hand, positive Masse's sign, weakness of the flexor digitorum profundus to the left small finger, positive Froment's, positive Mumenthaler's, non-tender range of motion in wrist, no evidence of carpal instability, no distal radioulnar joint instability, positive Tinel's at the cubital tunnel, negative carpal compression, negative compression of Guyon's canal, no evidence of thenar atrophy, no abductor pollicis brevis weakness and his two point discrimination was at 5 mm for median nerve distribution and 10 mm for ulnar nerve distribution on the left hand (R. 239-40). Plaintiff had no complaints with his right upper extremity (R. 240). X-rays revealed calcification with the left ulnar artery but no dilatation of the ulnar artery. Dr. Fritz diagnosed Plaintiff with left carpal tunnel syndrome and left ulnar neuropathy and suggested that a new EMG was needed to determine if surgery was required. He indicated that Plaintiff would return to work without using his left arm.

During a March 26, 2003, consultation Dr. Zuckerman noted that Plaintiff's retinopathy had been treated causing some leakage distal to the macula (R. 102). Dr. Zuckerman suggested that Plaintiff follow-up with Dr. Haimann regarding the leakage.

Plaintiff visited Dr. Haimann on April 14, 2003, and was diagnosed with mild perimacular edema following photocoagulation and very mild diabetic retinopathy (R. 105). Dr. Haimann did not recommend photography or laser and suggested that a follow-up exam be scheduled in one year.

On April 28, 2003, Dr. Fritz reevaluated Plaintiff and found continued significant weakness in the ulnar nerve distribution in the left hand and the April 9, 2003, EMG showed an increase in left ulnar neuropathy (R. 237). The EMG showed severe left ulnar neuropathy of the elbow and mild median mononeuropathy with polyneuropathy. Plaintiff had developed atrophy in the interossei muscles and adductor pollicis and was positive for Froment's and weakness with abduction and

8

adduction. He had weakness if the flexor digitorum profundus to the small fingers and numbness and tingling in the median and ulnar nerve distribution of the left hand. It was agreed that a surgical release of the left carpal tunnel would be performed.

On May 23, 2003, Dr. Fritz performed left carpal tunnel release and left ulnar nerve in situ decompression at the elbow (R. 107-08). The surgeon found a "significant amount of ulnar neuropathy and median neuropathy" (R. 108). Plaintiff was discharged the same day with instructions to restrict activities for the day and resume light to normal activities the following day (R. 110).

Dr. Fritz reevaluated Plaintiff on June 2, 2003, and found his incision healing well, distal neurovascular status improved, median and ulnar nerve two point discrimination at 5 mm and a decrease in tingling and less weakness in the ulnar nerve distribution (R. 236). Plaintiff's sutures were removed and he was instructed in a home exercise program. Dr. Fritz stated that Plaintiff would remain off work and return in two weeks.

Dr. Fritz reevaluated Plaintiff on June 17, 2003, and found that his left wrist and elbow incisions were healing well, his flexor digitorum profundus to the left small finger demonstrated significant improvement, he demonstrated improvement in interossei abduction strength and the adductor pollicis remained weak but appeared somewhat improved (R. 235). Plaintiff was working on exercises and asked to be returned to work with a 10 pound weight limit starting June 23, 2003.

Deborah Bailey from James Learner, D.O.'s office completed a Return To Work Notice indicating that Plaintiff was disabled from work from July 7, 2003, but could return on the 14th without restrictions (R. 224).

Plaintiff missed an August 4, 2003, appointment with Dr. Fritz (R. 234).

9

On August 11, 2003, Dr. Learner filled out forms indicating that Plaintiff was under his care from August 7 through 11 and could return to work on the 12th, but could not work more then 8 hour shifts due to insulin dependance (R. 223).

On August 19, 2003, Deborah Bailey's office completed a form indicating that Plaintiff could return to working 10 hour days (R. 222).

Deborah Bailey completed a Certificate To Return To Work Or School for Plaintiff on August 27, 2003, stating that Plaintiff had been unable to operate machinery that could put him at risk if hands cramped up, or lift more than 10 pounds from August 25 through 27 (R. 221).

On September 3, 2003, Dr. Learner filled out a short-term disability form indicating that Plaintiff was disabled from working with machinery that could put him at risk if his hands cramped up, or lifting over 10 pounds from August 27, 2003, pending evaluation by Dr. Stephen Hyman (R. 219).

On September 8, 2003, Dr. Stephen C. Hyman, M.D., evaluated Plaintiff for spasm, cramping and locking of his fingers and hands and cramping of the feet (R. 131). Plaintiff reported that he had been having difficulty with his hands while working and that he had been off work for 5 ½ months, after returning to work, he again had to stop and remained off since September 1, 2003 (R. 132). Plaintiff reported no numbness, paresthesias, neck pain or radicular pain. Upon physical examination Dr. Hyman found Plaintiff's neurological and manual motor skills to be normal, with the exception of some mild weakness with the left finger muscalature. He had full cervical, shoulder and lumbosacral range of motion and was independently mobile. Opening and closing his hands caused discomfort, but he did not trigger and reported that it was heavy work that made the hands trigger. Dr. Hyman ordered an EMG to rule out peripheral neuropathy and recommended that Plaintiff rest

his hands, stay off work for 2 weeks, start the anti-inflammatory Celebrex and follow-up in two weeks.  He noted that if triggering continued then cortisone injections may be necessary.

Dr. Fritz reevaluated Plaintiff on September 23, 2003, and determined that the left ulnar neuropathy had resolved, though Plaintiff still complained of bilateral hand cramping (R. 232). Plaintiff explained that his hands were not actually triggering, but were cramping intermittently, with the middle fingers being worse than the ring fingers but with all fingers being involved.  Dr. Fritz injected a solution into Plaintiff's middle fingers in attempt to provide him with some relief, explained that it might take several days for relief to come, and asked Plaintiff to schedule a reevaluation in a couple of weeks.  On September 25, 2003, Plaintiff called Dr. Fritz to tell him that the injections had not provided him with any relief and that his hand cramping had increased (R. 231).  Dr. Fritz spoke with Dr. Hyman and asked him to perform an upper extremity EMG to rule out neuropathy.

Dr. Hyman reported on October 2, 2003, that he evaluated the plaintiff for cramping and hand pain and feet pain and paresthesias, which had been progressive for the past one to two years (R. 129).  Dr. Hyman noted that an October 1, 2003, lower extremities EMG had confirmed mild to moderate lower extremity peripheral neuropathy.  He performed an upper extremity EMG which showed peripheral neuropathy in the upper extremity with delayed distal ulnar sensory and ongoing axonal denervation.

On October 15, 2003, Dr. Fritz assessed Plaintiff as having bilateral peripheral neuropathy and suggested that it might be in his best interest to apply for the long term disability because his peripheral neuropathy could impede his safety in the work place and he was "unaware of any therapeutic intervention that can reverse the course of this peripheral neuropathy" (R. 229-30).

11

Plaintiff complained of intermittent and minimally painful hand cramping with minimal numbness and/or tingling that had been going on for two years and which interfered with his daily life and his work as a machinist (R. 229). Plaintiff explained that when the cramping was present he was unable to hold things in both hands. Physical examination revealed no erythema or swelling, no signs of infection, intact distal sensation to less than 5 mm, capillary refill in less than 2 seconds, intact motor nerves and no range of motion defects. Dr. Fritz determined that Plaintiff was taking only one tablet per day of Neurontin though Dr. Learner had prescribed 300 mg to be taken three times per day, and he discussed the discrepancy with Plaintiff (R. 230).

Dr. Fritz wrote a letter on October 28, 2003, noting that Plaintiff had a history of diabetes and peripheral neuropathy with demyelimating and axonal mixed picture and complained of hand cramping and painful hands with decreased ability to hold objects, dropping multiple objects while at work and difficulty using his hands (R. 228). Dr. Fritz explained that he had expressed his concern regarding the possibility of Plaintiff's neuropathy impeding Plaintiff's safety at work and had suggested a disability evaluation.

On November 24, 2003, after a telephone interview and previous examination, Dr. Fritz wrote a letter indicating that Plaintiff's job as a machinist had "aggravated his neuropathy and contributed to his disability" (R. 227).

Upon reevaluation by Dr. Fritz on December 22, 2003, Plaintiff was found to have no weakness with abduction or adduction in the left upper extremity, no weakness in the flexor digitorum profundus to the small finger, no evidence of atrophy, no excessive tenderness at the cubital tunnel and no evidence of ulnar nerve subluxation (R. 226). Dr. Fritz suggested continued observation. Plaintiff explained that he was trying to "achieve disability" and would return if

12

symptoms persisted or if he noticed weakness.

Dr. Learner wrote a letter on February 9, 2004, in which he reported that Plaintiff's blood sugars have been poorly controlled of late and his neuropathy had gotten worse with considerable numbness and pain (R. 282).  He went on to say that Plaintiff had moderate success after carpal tunnel release of the left hand but developed severe pain in the left hand and is now unable to grip and has constant pain in the ulnar distribution of the left hand.  Dr. Learner felt that Plaintiff was unable to work and was completely disabled.

Dr. Learner wrote a letter in support of Plaintiff's disability application on June 18, 2004, in which he reported that Plaintiff's sugars were poorly controlled and "He has considerable trouble with his left arm from carpal tunnel syndrome, as well as ulnar neuropathy. ....  The patient continues to have problems with his arm in spite of physical therapy and surgery. Work aggravates this considerably, as he's unable to feel properly or work his arm properly.  His strength is also impaired" (R. 281).

On January 20, 2004, a Physical Residual Functional Capacity Assessment was completed by a Department of Disability Services (DDS) physician (R. 241- 48).  The physician found that Plaintiff had the RFC to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk 6 hours in an 8 hour workday, sit about 6 hours in an 8 hour workday, push and/or pull without limitation, with limited exposure to extreme cold or heat.

### 4.      Vocational Evidence

Mary Williams, the vocational expert (VE) at Plaintiff's administrative hearing, classified Plaintiff's past employment as a machinist as "light machine operator or light machinist" (R. 320), with a skill level between semi-skilled and skilled (R. 326).  The skills at these jobs were non-

transferable.  The ticket-taking job was classified as light and unskilled, the food service work was light to medium unskilled and the pizza delivery was light and unskilled (R. 327).

VE Williams was asked to consider the ability of a hypothetical person of Plaintiff's age, education and work experience who was capable of performing light work which required: only occasional bending at the waist or knees, kneeling, crawling, or climbing stairs; no climbing ladders or operation of motor vehicles; no exposure to unprotected heights or hazardous uncovered moving machinery; only occasional exposure to temperature extremes; no use of the left hand for feeling, fine sense of touch or sensation; no constant repetitive wrist movements, or forceful or sustained gripping and grasping with the non-dominant left hand (R. 330).  When asked whether such a person could perform Plaintiff's past work, either as he actually performed it or as it exists in the national economy, VE Williams testified that such an individual could perform the ticket-taking position.

When asked whether there were any other unskilled work that such a person could perform, VE Williams testified that such an individual could perform light jobs that were available in the regional economy in following categories and number of jobs available: inspector positions, 12,900; information clerk, 1,700; usher, 1,300; sorter, 2,415 and self-serve gas station attendant, 5,980 (R. 331).

A 10 pound weight lifting limitation would eliminate all the positions except the information clerk and the usher.  If the hypothetical person were further limited to only brief periods of handwriting, no more than 5 minutes on a computer or typewriter and no independent use of his left arm the information clerk and usher positions would still be available (R. 332).

The hypothetical person would be precluded from all employment if limited to working no longer than 30 minutes at a time before needing to lie down and rest for 30 minutes (R. 332).  VE

14

Williams also testified that there would be no competitive employment available for a person who had no use of their hands for a period of 2 hours each day due to cramping (R. 334-335).

### 5.       The ALJ's Decision

ALJ Jones found that Plaintiff met the disability insured requirements of the Act and was insured for benefits through the date of his decision, November 8, 2004 (R. 25).

The medical evidence documented the presence of impairments "best described as: juvenile onset diabetes mellitus with peripheral neuropathy and mild retinopathy; hypertension; renal insufficiency; episodes of gastroenteritis; left ulnar neuropathy status post decompression surgery (May 2003); left carpal tunnel surgery status post release surgery (May 2003); and diffuse muscle cramping of unknown etiology" (R. 22-23).  Plaintiff had a combination of impairments that were collectively "severe" within the meaning of the Regulations, but not sufficiently severe to meet or equal the requirements of any impairment listed in Appendix 1, Subpart P, of Regulations No. 4 (20 C.F.R. 404 1520(d)) (the "Listing") (R. 23, 25).

No period of 12 consecutive months had elapsed during which Plaintiff lacked the RFC to perform light work that involves lifting and carrying no more than 10 pounds, only occasional bending at the waist or knees, kneeling, crawling, or climbing stairs; no climbing ladders or driving; occasional reaching forward or overhead with left hand; occasional gross or fine manipulation with left hand; no feeling with the left hand; no forceful or sustained gripping and grasping with either hand; no constant repetitive movements with either hand, no use of vibrating hand tools; only occasional exposure to very hot or very cold temperatures (R. 25).

Plaintiff's allegations regarding his functional limitations were not fully credible because they were inconsistent with the absence of more aggressive treatment and Plaintiff's ordinary activities

15

which include caring for his 3 year old son (R. 23). He noted that the medical evidence did not document any impairment that could reasonably produce the constant immobilizing cramps described by Plaintiff, and that such symptoms have not been observed by trained medical personnel.

Plaintiff is unable to perform any of his past relevant work and his skills from this work are non-transferrable (R. 25-26). Using the Medical-Vocational Guidelines as a framework, together with the testimony of VE Williams, ALJ Jones determined that Plaintiff could perform a significant number of jobs in the economy referring to the limited number of light jobs identified by VE Williams, and Plaintiff was, therefore, not disabled (R. 26).

## II.    ANALYSIS

### A. STANDARDS OF REVIEW

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry their burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than their past work, the testimony must be given in response to a hypothetical question that accurately describes

16

Plaintiff in all significant, relevant respects.[4]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which Plaintiff can perform.

**B. FACTUAL ANALYSIS**

Plaintiff raises three challenges to the Commissioner's decision: (1) ALJ Jones' finding that Plaintiff was not fully credible was not supported by substantial evidence in the record; (2) ALJ Jones improperly relied upon the opinion of the DDS physician's opinion; and (3) the hypothetical posed to VE Williams did not include all of the limitations ALJ Jones included in the RFC in his opinion.

**1.      Credibility Determination**

Commissioner's regulation 20 C.F.R. 404.1545 requires consideration of all medical and non-medical evidence, including the claimant's subjective accounts of symptoms, in determining residual functional capacity (RFC).  Subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record that would explain such pain.  *See Young v. Secretary of Health & Human Servs.,* 925 F.2d 146, 150-51 (6th Cir. 1990); *Duncan v. Secretary of Health & Human Servs.,* 801 F.2d 847, 852 (6th Cir. 1986).  Yet, subjective evidence is only considered to "the extent...[it] can reasonably be accepted as consistent with the objective medical evidence and other evidence (20 C.F.R. 404.1529(a))*."  Duncan*, 801 F.2d at 852.  Plaintiff argues that his subjective complaints of pain are not contradicted by the dearth of information in the record and ALJ Jones therefore erred in finding him not fully

---

[4] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

credible.

Jones v. Commissioner, 336 F.3d 469, 476 (6th Cir. 2003), notes that an ALJ can reject a claimant's credibility on pain and other symptoms, and exclude these from the hypothetical question to the VE, if the ALJ's reasons are adequately explained.

If the ALJ rejects a claim of pain, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons. SSR 96-7p directs that with respect to findings on credibility they cannot be general and conclusory findings but rather must be specific. The ALJ must say more than that the testimony on pain is not credible. Felisky v. Bowen, 35 F.3d 1027, 1039 (6th Cir. 1994), made it clear that the ALJ cannot merely recount the medical evidence and claimant's daily activities and then without analysis summarily conclude that the overall evidence does not contain the requisite clinical, diagnostic or laboratory findings to substantiate the claimant's testimony regarding pain. Id. at 1039. "The SSA regulations clearly state that this is not the end of the analysis. 20 C.F.R. § 404.1529(c)(2)." Id. The ALJ must also consider the claimant's daily activities; the location, duration, frequency and intensity of pain; precipitating and aggravating factors; type, dosage effectiveness and side effects of medication; treatment other than medication; and any other measures taken to relieve pain. Id. at 1039-1040.

In the present case ALJ Jones found Plaintiff's complaints of pain to be against the weight of the following evidence: the lack of more aggressive treatment; his ordinary activities, which included caring for his son; and the medical evidence, which he felt did not "document any impairment that could reasonably produce the utmost constant immobilizing cramps described" by Plaintiff and failed to show that any medical personnel had observed the symptoms (R. 23).

Plaintiff had the burden of providing objective evidence confirming the severity of his alleged

18

pain, or establishing that the medical condition is of such a kind and severity that it could reasonably be expected to produce the allegedly disabling pain. *Duncan*, 801 F.2d at 853 (6th Cir. 1986), notes "First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *See also, McCormick v. Secretary*, 861 F.2d 998, 1002-1003 (6th Cir. 1988); 20 C.F.R. § 404.1512 and 416.913(e)(requiring claimants to provide all medical evidence in support of their claims).

Here, Plaintiff has substantial objective and clinical diagnostic evidence of underlying bilateral peripheral neuropathy in the upper and lower extremities (R. 129), confirming his diagnosis of a severe "underlying medical condition." As in most cases, there is no objective evidence of the pain itself for the relevant time period. Thus, the analysis must be "whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." The imbalance between his subjective evidence and the medical record is central to this analysis.

Subsequent to Plaintiff's May 2003 left carpel tunnel release and left ulnar nerve decompression surgery and through October 15, 2003, the medical records show that Plaintiff continued to complain that his hands and feet were cramping (R. 129, 131, 229, 231, 232).[5] Yet

---

[5]The records subsequent to October 15 are mainly letters from Plaintiff's doctors, apparently written in support of his disability application. Dr. Fritz writes a "to whom it may concern" letter in which he suggests a disability evaluation, that he felt that Plaintiff's hand cramping could have impeded his safety at his job and that he believes Plaintiff's job aggravated his condition (R. 227, 228). Dr. Learner writes that Plaintiff is completely disabled due to his inability to grip and constant pain in the ulnar distribution in the left hand which continues despite surgery and physical therapy (R. 282). The last actual medical record in the file is a December 22, 2003, letter to Dr. Learner, in which he indicates that Plaintiff bumped his left elbow causing paresthesias in his small finger (R. 226). He found no weakness,

19

Plaintiff's complaints to his treators never appeared to have reached the level of severity of which he complained at his hearing - a review of all the records reveals no indication that he ever reported that he had to lie down for most of the day, that the cramping lasted for hours at a time, or that the pain associated with the "intermittent" cramping was anything more than minimal.  A possible exception being the letters written by Dr. Learner in 2004.

Dr. Learner writes on February 9, 2004, that Plaintiff's peripheral neuropathy has gotten worse, causing considerable numbness and pain (R. 282).  The corresponding treatment note from February 9, 2004, indicates that Plaintiff complained that his left hand was numb and tingling (R. 289).  Dr. Learner also wrote that Plaintiff's left ulnar neuropathy was unresolved with surgery and he was still unable to grip and had pain in his left hand in the ulnar distribution (R. 282).  In Dr. Learner's subsequent letter, June 18, 2004, he indicates again that Plaintiff's left arm is afflicted with carpal tunnel and ulnar neuropathy (R. 281).  He goes on to say that work aggravates the condition and that Plaintiff is unable to work his left arm or feel properly with it and that his strength is impaired.  While Dr. Fritz's "To whom it may concern" letters only suggest disability from Plaintiff's past work.  Dr. Learner's similar letter asserts that Plaintiff is "completely disabled at this time."  Yet, this evidence does not support a remand for a new credibility determination for three reasons.

First, Dr. Learner's treatment notes do not contain any objective medical evidence, at least nothing legible, to suggest that Plaintiff's condition had worsened to the point that Dr. Learner is suggesting.  In fact, Dr. Fritz reported in September 2003 that Plaintiff's left ulnar neuropathy had been resolved (R. 232).  Subsequent EMGs showed peripheral neuropathy, accounting for the bilateral hand cramping, but no objective medical evidence exists in the record to support Dr.

--------

loss of sensation, atrophy, excessive tenderness or ulnar nerve subluxation.

Learner's contention that Plaintiff's ulnar neuropathy had returned or worsened.  When Dr. Fritz examined Plaintiff in December 2003 after he bumped his left elbow, and three months before Dr. Learner's first letter, Dr. Fritz observed no weakness, atrophy, tenderness or ulnar subluxation in the left arm and hand (R. 226).  Thus, the available objective clinical evidence was inconsistent with Plaintiff's subjective complaints.

Second, Dr. Learner's letters indicate, in sum, that Plaintiff's left arm is virtually unusable for work.  ALJ Jones included in his hypothetical to VE Williams a condition that the hypothetical person had "basically no use of the left arm...no gripping or grasping or reaching or pushing or pulling, handling, fingering...it could not be used independently" (R. 332).  VE Williams testified that a hypothetical person with this limitation would still be able to perform 3,000 jobs in the regional economy (1,700 information clerk and the 1,300 usher positions) (R. 331, 332).  Therefore ALJ Jones included in the hypothetical Plaintiff's testimony that is supported by Dr. Learner's letter's and still had substantial evidence that there were a significant number of jobs that Plaintiff could perform. [6]

Third, neither the letters, nor anything else in the record, support Plaintiff's contention that he must lie down for significant periods each day.  None of his treating physicians, including those who were clearly writing letters in support of his application for disability, ever indicated that he was limited in this manner.  Therefore, there is substantial evidence in the record to support ALJ Jones contention that Plaintiff's contention that his condition was more limiting than any of his treating

---

[6] 42 U.S.C. § 423(d)(1) defines "disability" as an inability to engage in any "substantial gainful activity"due to an impairment. Under § 423(d)(2)(A) this means an inability to do "substantial gainful work which exists in the national economy" which is defined as "work which exists in significant numbers either in the region where such individual lives or in several regions." The Sixth Circuit held that 1,350  to 1,800 jobs in a nine-county area satisfied this "significant number" requirement. *Hall v. Bowen*, 837 F.2d 272 (6th Cir. Jan. 20, 1988).

physicians had indicated was not credible.

It is true that ALJ Jones reliance on the "lack of more aggressive treatment" is puzzling in this case given that Plaintiff has been subjected to surgery, physical therapy, prescription medication and injections into his fingers.  Further, Dr. Fritz stated that she was "unaware of any therapeutic intervention that can reverse the course of this peripheral neuropathy" (R. 229-230).  And, ALJ Jones reliance on Plaintiff's "ordinary activities which include caring for his three-year old son" is also without much support in the record.  ALJ Jones did not flesh out Plaintiff's daily activities during the hearing and Plaintiff's disability application, if taken on its face, indicates that Plaintiff does nothing more than watch television, eat and take a shower on most days (R. 80-81, 89-91).  In fact, in his application he indicated that sometimes his hand cramping prevents him from bathing, shaving and feeding himself (R. 81).  Plaintiff did indicate that he takes care of his son in response to the question "Do you take care of anyone else..." (R. 80).  Yet this cannot be taken as substantial evidence that he is the primary day-to-day caregiver for the child when all of the remaining evidence is contrary and this question is quite ambiguous about what it means to "take care" of another.  It may well be that he is the primary caregiver, but because there is no testimony on the subject of his daily activities or his role with the child, there is not substantial evidence in the record to support this finding.[7]  Yet given that the ALJ was present to evaluate the credibility of Plaintiff's in-person testimony, this Court

---

[7] Noting the flexibility of timing in the home that is not available in the workplace "performing an extensive range of daily activities, including taking care of two small children, cooking, cleaning, and shopping" has been treated with skepticism and is not substantial evidence to uphold a finding of a capacity for light work which ALJ Jones found Plaintiff could do in this case. *Gentle v. Barnhart,* 430 F.3d 865, 867-68 (7th Cir. 2005) (Posner, J.) ("The administrative law judge's casual equating of household work to work in the labor market cannot stand. [The claimant] *must* take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts. A person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working." Citations omitted.)

is limited to evaluating whether or not the ALJ's explanations for discrediting Plaintiff were reasonable and supported by substantial evidence in the record. *Jones v. Comm'r Soc. §*, 336 F.3d 469, 476 (6th Cir. 2003). Because there is substantial evidence to support the ALJ's finding that Plaintiff was not fully credible in that the level of pain and disability were inconsistent with that reported to his treators, it is recommended that the matter not be remanded for a new credibility determination.

### 2.        Reliance Upon DDS Physician's Opinion

Plaintiff argues that ALJ Jones improperly relied upon the DDS physician's opinion, a non-treating source, where such was contradicted by Plaintiff's treating physician, Dr. Learner. In the January 20, 2004, Physical Residual Functional Capacity Assessment completed by the DDS physician Plaintiff was found to have the RFC to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk 6 hours in an 8 hour workday, sit about 6 hours in an 8 hour workday, push and/or pull without limitation, with limited exposure to extreme cold or heat (R. 241- 48). This opinion, Plaintiff argues, is contradicted by the 10 pound lifting restriction Dr. Learner put in place in August 2003.

Yet ALJ Jones appears to have adapted Dr. Learner's lifting restriction when he found Plaintiff to have the RFC to perform light work that involves lifting and carrying no more than 10 pounds, only occasional bending at the waist or knees, kneeling, crawling, or climbing stairs; no climbing ladders or driving; occasional reaching forward or overhead with left hand; occasional gross or fine manipulation with left hand; no feeling with the left hand; no forceful or sustained gripping and grasping with either hand; no constant repetitive movements with either hand, no use of vibrating hand tools; only occasional exposure to very hot or very cold temperatures (R. 25). Therefore,

Plaintiff's argument that ALJ Jones improperly favored the DDS physician over Dr. Learner need not be addressed further.

### 3.  Hypothetical Question Posed to VE Williams

Plaintiff argues that the hypothetical ALJ Jones posed to VE Williams did not include all of the limitations he ultimately found Plaintiff to have in his opinion.  Plaintiff is correct about the fact, though not the extent, that the two RFC are materially different.

ALJ Jones asked VE Williams to consider a hypothetical person who could perform light work with the following limitations:

- only occasional bending at the waist or knees, kneeling, crawling, or climbing stairs; no climbing ladders or operation of motor vehicles; no exposure to unprotected heights or hazardous uncovered moving machinery; only occasional exposure to temperature extremes; no use of the left hand for feeling, fine sense of touch or sensation; no constant repetitive wrist movements, or forceful or sustained gripping and grasping with the non-dominant left hand (R. 330);
- 10 pound lifting restriction (R. 331);
- only brief periods of handwriting and no more than 5 minutes on a computer (R. 332); and
- no independent use of left arm (R. 332).

VE Williams testified that a hypothetical person with these limitations would still be able to perform the 1,700 information clerk and 1,300 usher positions that were available in the regional economy (R. 331-332).  Yet in ALJ Jones opinion he found that Plaintiff had a different RFC which included the ability to: perform light work that involves lifting and carrying no more than 10 pounds, only occasional bending at the waist or knees, kneeling, crawling, or climbing stairs; no climbing ladders or driving; occasional reaching forward or overhead with left hand; occasional gross or fine manipulation with left hand; no feeling with the left hand; no forceful or sustained gripping and grasping with either hand; *no constant repetitive movements with either hand*; no use of vibrating hand tools; only occasional exposure to very hot or very cold temperatures (R. 25)(emphasis added).

24

Plaintiff argues that ALJ Jones failed to present to VE Williams the following limitations which he found Plaintiff to have in his opinion: inability to drive, occasional gross or fine manipulation with left hand, no forceful or sustained gripping and grasping with *either* hand and no constant repetitive movements with *either* hand.  Yet, ALJ Jones did ask VE Williams to consider a hypothetical person with limitations which prevented them from operating motor vehicles or independent use of the left arm.  The critical difference in the two RFCs is that the VE was presented with a person who could do no forceful or sustained gripping and grasping with "the non-dominant left hand" but the ALJ found this limitation applied to "either" hand or both hands as did the limitations on "constant repetitive movements with either hand."  This is not a small difference and there is evidence in the record to support a finding that Plaintiff is limited in this capacity given his long standing complaints of bilateral hand cramping.

Defendant argues that there is no requirement that the description of Plaintiff's RFC in an ALJ's decision mirror that posed to a VE.  Yet it is well established that an ALJ may only rely upon the testimony of a VE if the hypothetical question posed thereto accurately described the claimant's limitations.  *Cole*, 820 F.2d at 775-76 (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw*, 810 F.2d at 790 ("The question must state with precision the physical and mental impairments of the claimant."); *Myers,* 514 F.2d at 294; *Noe*, 512 F.2d at 596.  As ALJ Jones' opinion currently stands he relies upon VE Williams' testimony regarding the availability of a significant number of jobs for a hypothetical person with fewer limitations than ALJ Jones found Plaintiff to have.  Nor can this be said not to be material or to be harmless error.  The information clerk and usher positions the ALJ relies on can be performed with

25

the use of one dominant extremity. But it is not obvious that some or possibly most of those jobs would be eliminated if the hypothetical worker cannot do sustained gripping or grasping or repetitive movements with either hand. Given this discrepancy between the ALJ's formal findings, which this Court cannot modify, and the hypothetical question upon which the ALJ relies, the VE's response cannot serve as substantial evidence that there are a significant number of jobs that Plaintiff can perform. Therefore it is recommended that this matter be remanded with instructions that a VE be presented with a hypothetical that includes all the limitations ALJ Jones found Plaintiff to have for a determination as to whether there exist jobs in the regional economy which Plaintiff may perform.[8]

### III.   RECOMMENDATION:

Accordingly, for the above stated reasons IT IS RECOMMENDED that Defendant's motion be DENIED and Plaintiff's motion be GRANTED IN PART.

The parties to this action may object to and seek review of this report and recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C.. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this report and recommendation. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Within ten (10) days of service of any

---

[8] It should be noted that it appears from the transcript that VE Williams testified that Plaintiff could perform his past work as a movie ticket taker (R. 330). Yet, is seems this work was in or before 1989 (R. 71, 312). Thus it is unclear that this past work " was done within the last 15 years" to qualify as relevant past work under 20 C.F.R. § 404.1565(a) and SSR 82-61 or 82-62.

objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: February 28, 2006                                 s/Steven D. Pepe
Ann Arbor, Michigan                                      UNITED STATES MAGISTRATE JUDGE



<u>Certificate of Service</u>

I hereby certify that a copy of this Report and Recommendation was served upon the attorney(s) of record by electronic means on February 28, 2006.

s/John F. Purdy
Deputy Clerk


27